## RESSINGER v. ADLER MFG. CO.
### Civ. No. 1275.

United States District Court
W. D. Kentucky, at Louisville.
Aug. 7, 1950.

Henry McElwain, Jr., and Allen, McElwain, Dinning & Clarke all of Louisville, Ky., for plaintiff.

Grover G. Sales, Louis Seelbach, and Middleton, Seelbach, Wolford, Willis & Cochran, all of Louisville, Ky., for defendant.

SHELBOURNE, District Judge.

Plaintiff, Paul Ressinger, a resident of Illinois, filed this action January 15, 1947, against defendant Adler Manufacturing Company, a corporation created under the laws of Kentucky.

Plaintiff sought a judgment in the sum of $78,070, claimed to be due as a result of transactions between the parties concerning the manufacture by defendant of baby sulkies (referred to generally in the record and hereinafter as Kiddigigs), designed and marketed by plaintiff.

The requisite diversity in citizenship and amount in controversy being present, this Court has jurisdiction. Title 28 U.S.C.A. § 1332(a) (1).

Various motions and numerous pre-trial conferences resulted in plaintiff filing on March 5, 1948, its amended and substituted complaint, resulting in re-pleading.

A trial was had to the Court without the intervention of a jury, in February 1950.

### Findings of Fact

1. Prior to June 1943, plaintiff designed a two-wheel baby cart or sulky, called a "Kiddigig", the novel feature of which was an absence of any metals except screws and nails necessary to join the parts together. Metal was in short supply, due to demands for the War.

2. June 26, 1943, plaintiff having previously submitted the design and specifications, placed an order with defendant for the manufacture of 6,000 Kiddigigs to be manufactured and packed in cartons and shipped to plaintiff's customers on his orders at an agreed price of $3.50 per Kiddigig, f.o.b. Louisville, Kentucky.

Defendant accepted the order upon agreement that the plaintiff forward to defendant his check for $7,000 to be credited against the last one-third of this order manufactured and delivered by defendant, orders for the first two-thirds of the 6,000 Kiddigigs to be paid for on the 10th and 25th of each month until the first 4,000 had been shipped; payment on the last 2,000 to be credited by application of the $7,000 deposit.

Shipment on this order was completed about August 9th, on which date plaintiff ordered an additional 30,000 Kiddigigs of the same model, the price to be $3.60 per Kiddigig, so long as defendant had on hand a supply of cartons in which to pack the orders, after which it was contemplated the packing would be in wire-bound crates which would increase the price to plaintiff to $3.72 per Kiddigig.

The agreement was reduced to writing October 2, 1943, by acceptance by defendant of a letter addressed to it by plaintiff reciting the transactions up to that date and providing a working agreement for anticipated future orders.

It was recognized in this contract that although the then demand for said product exceeded the production rate, nevertheless due to various factors, "such demand may decrease or entirely cease, perhaps abruptly, forcing me (plaintiff) to cancel my production orders to you and that in any such event you may incur certain expenses and losses for canceling your then outstanding commitments for materials and purchased parts and in liquidating your finished and unfinished inventory then on hand. Under the above mentioned arrangement, I have assumed full responsibility for all such expenses and losses due to any such cancellations and agreed to reimburse and hold you harmless in respect thereof."

The contract provided that a reserve fund of $35,000 be created and maintained to be at all times in the possession and under the control of defendant and available to it for the purpose of paying and reimbursing it for expense and loss incurred on account of canceling orders and liquidating inventory, in the event plaintiff should cancel production orders.

In order to create the reserve fund, plaintiff agreed to pay defendant the sum of ninety cents on account of each Kiddigig manufactured and shipped by it until such time as such payment accumulated a reserve fund of $35,000, provided that in the event the price of $3.50 per Kiddigig to plaintiff be increased, the ninety cents reserve fund payment should be decreased by the amount of such increase in price down to a minimum of sixty-eight cents.

As security for plaintiff's obligations to defendant, he agreed to and did assign and transfer to defendant all present and future accounts receivable and invoices for Kiddigigs sold by him and manufactured and shipped by defendant.

All monies and checks received in payment of invoices to customers were to be deposited in a special account in the Northern Trust Company, Chicago, Illinois, in a special account in the name of "Juvenile Health Products Special Account." Funds so deposited would be subject to withdrawal only upon checks signed by plaintiff and countersigned by a Comptroller. The expense of the employment of the Comptroller was to be borne by the plaintiff, and the Comptroller was to have access to all books, records and papers pertaining to the Kiddigig business.

3. The entire lots of 6,000 and 30,000 Kiddigigs were manufactured and shipped to plaintiff's customers. Invoices were paid by plaintiff substantially upon the 10th and 25th of each month up to and including the invoice of April 1, 1944. The amounts withdrawn and credited to the reserve fund deposited in the Northern Trust Company were as follows—

| "Date Received | Amount | Total |
|---|---|---|
| November 3, 1943 | $9,345.94 | |
| December 10, 1943 | 8,922.28 | $18,268.22 |
| January 4, 1944 | 9,392.84 | 27,661.06 |
| February 10, 1944 | 3.95 | 27,665.01 |
| February 11, 1944 | 2,254.20 | 29,919.21 |
| March 7, 1944 | 97.92 | 30,017.13 |
| April 5, 1944 | 568.48 | 30,585.61 |
| May 2, 1944 | 47.60 | 30,633.21" |

It is admitted that there was in the reserve fund at the time of the trial $30,790.83.

In December 1943, believing that metal would become available for manufacture of baby carts and that the demand and salability of the Kiddigigs would be materially impaired, if not destroyed, production was discontinued at 78,000 units.

4. Between April 1 and July 1944, the plaintiff did not pay to the defendant the proceeds of sale of Kiddigigs shipped to his customers by the defendant and it is admitted by the parties that defendant is due from plaintiff $2,428.55 on this item.

5. On July 11, 1944, there remained on hand at defendant's plant in Louisville, Kentucky, 18,896 Kiddigigs, for which there were no orders.

Correspondence and telephone conversations ensued in which the defendant was urging plaintiff to dispose of the Kiddigigs, defendant to deliver to the plaintiff or a warehouse of his choosing the Kiddigigs on hand at a price of $3.78 per unit.

Meanwhile, by agreement of the parties, rubber tires had been added, which increased the cost per unit to $4.15.

Defendant's letter of July 11, 1944, was as follows—

"In accordance with our telephone conversation of today, we are offering you the opportunity of clearing up your account with us by the payment of $22,518.00 and our delivery to you or a warehouse of your choosing, 18500 Kiddigigs. This amount is made up as follows:

| | |
|---|---|
| 18,500 Kiddigigs @ 3.78 | 69,930 |
| A/C Rec 6/27/44 | 3,432 |
| Parts in Process | 1,750 |
| Storage Charges | 2,331 |
| | $77,443 |
| Cr. Kiddigigs a/c | 30,633 |
| Cr. Parker Pen a/c | 29,600 |
| | 60,233 |
| Advances Parker Pen Parts | 5,308 |
| | 54,925 |
| Balance due | $22,518 |

"In the event that you accept this proposition, the few Kiddigigs that there might be over or under the quantity of 18,500 should be added to or deducted from the above balance at the rate of $3.78 each.

"I believe this is a good deal for you and trust you will find it possible to consummate it."

Plaintiff did not answer this letter until August 1, 1944, at which time he wrote defendant advising it that the offered price of $3.78 per Kiddigig was satisfactory, provided the Kiddigigs were as described "on the telephone."

The letter in part said—"I reserve the right, of course, to inspect them and reject any that are not according to my specifications or of satisfactory workmanship."

August 2, 1944, defendant not having received plaintiff's reply to its letter of July 11th, expressed disappointment at not having heard from plaintiff and advised him that unless a satisfactory settlement was had "by next Monday" defendant intended to sell the Kiddigigs remaining on hand to the highest bidder and that the defendant would liquidate the account in accordance with the contract.

Under date of August 9th, plaintiff wrote defendant as follows—

"Please start shipping by truck immediately and not later than August 12th, my inventory of Kiddigigs to

"Paul M. Ressinger
"c/o D. B. Mehl
"156 W. Oak Street
"Chicago, Ill.

"The kiddigigs must be packed properly in order to avoid damage in transit. Otherwise, I would have so much repair work to do on them that they would cost me considerably more than the former price of $4.15. All rejections will, of course, be shipped back to you at your expense.

"I wish to emphasize why I am having these Kiddigigs shipped to me at Chicago. I am doing this so that I can personally see that each and every one is carefully checked before shipments are made to my customers. I simply must do this in order to avoid repetitions of the many mishaps which occurred during the time shipments were being made from Louisville."

Under date of August 14, 1944, defendant replied to this letter guaranteeing that the Kiddigigs to be shipped would be in accordance with plaintiff's specifications. On August 14, 1944, plaintiff sent defendant the following telegram—"Have shipments started on inventory of Kiddigigs. If not please write explaining why because as you know each days delay is causing me financial damage. I prefer not to have any more verbal negotiations with your company. Consequently will not take long distance calls."

The following day defendant wrote plaintiff a letter setting out the account between them. That statement is as follows—

"The following is a statement of our account with you brought up to-date:

| | |
|---|---|
| 18,622 Kiddigigs @ 3.78 | $70,391.16 |
| A/C Recn. 8/10/44 | 4,223.85 |
| Parts in Process | 1,750.00 |
| Storage Charges to 8/1/44 | 2,483.20 |
| | $78,848.21 |
| Cr. Kiddigig a/c | 30,633.00 |
| Cr. Parker Pen a/c | 29,600.00 |
| | 60,233.00 |
| Advance Parker Pen Parts | 5,402.70 |
| | 54,830.30 |
| Balance due | $24,017.91 |

"You will note that storage charges have been brought forward to August 1st and that the advances for Parker Pen parts include the last items which covered electrical equipment and amounted to $94.92."

August 22, 1944, plaintiff inquired by telegram if defendant was shipping the orders to which defendant replied on the same date that no orders would be shipped except for cash in advance until the account was paid up.

6. Between August 1944 and January 1945, defendant disposed of 18,896 Kiddigigs and received for same $33,272.65. There is filed as defendant's trial exhibit #44, a copy of a statement, the original of which was mailed to plaintiff January 13, 1945. Defendant there charges plaintiff on account of the 18,896 units $78,418.40, being on the basis of $4.15 per unit.

An examination of the exhibit, however, shows that the unit price of $4.15 is written over an erasure and that the unit price was first written as $3.78 the same as that shown in the statement embodied in defendant's letter of August 15, 1943.

Defendant had in its letter of July 11, 1944, offered to deliver the remaining units to plaintiff for a unit price of $3.78 and that offer was accepted by plaintiff. Defendant, however, elected, doubtless on account of its lack of confidence in plaintiff's credit, to sell the Kiddigigs on the market to purchasers other than plaintiff.

In its letter to plaintiff of August 2, 1944, defendant referred to its letter of July 11th and advised him that unless a satisfactory settlement was received by "next Monday" it would proceed to sell the merchandise and credit plaintiff's account with any amount over and above the amount due by plaintiff and correspondingly to charge plaintiff's account with anything under the amount due from him.

At the time this letter was written, defendant had in the reserve account $54,994.17, the aggregate of the Kiddigig reserve account of $30,790.83 and a reserve of $24,203.34 resulting from the Parker Pen Company display stand.

7. About June 1944, plaintiff designed and procured defendant to manufacture and ship to the Parker Pen Company, 4,020

308

display stands, for which defendant credited plaintiff with $7.40 for each stand, so paid for, and it is admitted that the plaintiff established in defendant's hands as a result of the Parker Pen display stands, a net credit of $24,203.34 and thereafter the total reserve fund on account of the Kiddigigs and the Parker Pen display stands amounted to $54,994.17.

6. Out of this amount, the plaintiff admits that there should be deducted for the Kiddigigs sold by him shortly after April 1944, the proceeds of which sales he did not place on deposit in the Chicago Bank, $2,438.55.

Plaintiff also admits that defendant is entitled to $1,107.26, as cost of parts on hand when production was stopped and the further sum of $97.97 for rocker stands.

Defendant has also claimed an item of $1,795.30, as the cost of decalcomanias, which it purchased for plaintiff.

Defendant seeks to charge plaintiff for the "decals", but admits their loss or destruction while in its custody. Therefore, an allowance to defendant for any amount on account of the "decals" is refused.

Defendant has included in its statement, an item of storage charges—$3,200.30. The evidence does not disclose any intention of the parties to charge or pay storage charges, and no evidence of any expense incurred by defendant for storage was presented. This claim is disallowed.

The final accounting between the parties is found to be—

| "Kiddigigs reserve account net | $30,790.83 | |
| Parker Pen Company—Reserve Account | 24,203.34 | |
| Total Due Plaintiff | | 54,994.17 |
| Accounts for sales of Kiddigigs received by plaintiff | $2,428.55 | |
| Amount chargeable to plaintiff resulting from sale of 18,896 Kiddigigs | 38,154.23 | |
| Value of parts on hand when production discontinued | 1,107.26 | |
| Value of Rocker Sets | 97.97 | 41,788.01 |
| Amount due Plaintiff | | $13,206.16." |

Conclusions of Law

1. The Court has jurisdiction of the parties and the subject matter. Title 28 U.S.C.A. § 1332(a).

 11. Plaintiff's acceptance of defendant's offer contained in its letter of July 11, 1944, to deliver 18,896 Kiddigigs to plaintiff at a unit price of $3.78 and defendant's election thereafter to sell the Kiddigigs to purchasers other than the plaintiff, estopped the defendant from claiming a unit price of $4.15 upon a final accounting with plaintiff. There was in the reserve account at that time $54,994.17.

It would be inequitable to charge plaintiff with the difference between a unit price of $1.75 (for which defendant sold the greater part of the units) and $4.15, after plaintiff's offer to accept the entire number then on hand at $3.78 per unit, subject only to the right of inspection.

111. On a final accounting, the Court concludes that plaintiff should recover from defendant $13,206.16, with interest and costs.

Judgment for that amount will be submitted, upon notice to defendant's Counsel.